James F. Evers   HI State Bar No. 5304
State of Hawaii
Office of Consumer Protection
235 S. Beretania Street, Room 801
Honolulu, Hawaii 96813
Phone: (808) 586-5980
E-Mail: jevers@dcca.hawaii.gov

Attorney for STATE OF HAWAII
OFFICE OF CONSUMER PROTECTION

UNITED STATES BANKRUPTCY COURT

DISTRICT OF HAWAII

| | |
|---|---|
| In re: | Case No. 15-01446 |
| | Chapter 7~~13~~ |
| ANABEL GASMEN CABEBE, | |
| Debtor. | |
| | |
| STATE OF HAWAII, by its OFFICE OF CONSUMER PROTECTION, | Adv. Pro. No. 16-90011~~—~~ |
| Plaintiff, | FIRST AMENDED COMPLAINT FOR FINAL JUDGMENT ADJUDICATING AND LIQUIDATING CLAIMS AND DETERMINING NONDISCHARGEABILITY OF DEBT, AND FOR DECLARATORY RELIEF AND PERMANENT INJUNCTIVE RELIEF; EXHIBITS "1" - "20~~1~~" |
| v. | |
| ANABEL GASMEN CABEBE, MORTGAGE ENTERPRISE, MORTGAGE ENTERPRISE INVESTMENTS, and MORTGAGE ENTERPRISES INVESTMENTS, | |
| Defendants. | |

+------------------+
|    EXHIBIT A     |
+------------------+

# FIRST AMENDED COMPLAINT FOR FINAL JUDGMENT ADJUDICATING AND LIQUIDATING CLAIMS AND DETERMINING NONDISCHARGEABILITY OF DEBT AND FOR DECLARATORY RELIEF AND PERMANENT INJUNCTIVE RELEIF

Plaintiff State of Hawaii, by its Office of Consumer Protection ("OCP"), through its attorney, James F. Evers, Esq., brings this action against Debtor Anabel Gasmen Cabebe ("Cabebe"), Mortgage Enterprise, Mortgage Enterprise Investments and Mortgage Enterprises Investments to: (i) adjudicate and liquidate its claims for common law fraud involving violations of Hawaii Revised Statutes ("HRS") Chapters 480 and 480E and 12 C.F.R. Part 1015 (the "MARS Rule"), (ii) award restitution to consumers, (iii) impose non-compensatory civil fines and penalties payable to OCP, (iv) determine the nondischargeability of the foregoing claims and debts, pursuant to 11 U.S.C. §§ 1328(a)(2) and 523(a)(2)(A), (v) award appropriate permanent injunctive relief, (vi) award appropriate declaratory relief such that the mortgages and financing statements created and recorded for clients of Mortgage Enterprise Investments, Mortgage Enterprise Investments or Mortgage Enterprise are rendered void and released; (vii) require MEI and ME to disgorge all ill-gotten gains collected from consumers, and (viii) award such other relief as the Court deems just and proper. The primary focus of this suit is the non-dischargeable nature of the underlying claims and debts, and the additional relief sought is merely incidental to the nondischargeability determination. In the interest of judicial

2

economy, it is appropriate for the Court to take the extra step of entertaining and awarding all of the requested relief.

For its First Amended Complaint, OCP alleges as follows:

## Parties

1. Cabebe is a debtor in the Chapter 13 case entitled In re Anabel Gasmen Cabebe, Case No. 15-01446 ("Bankruptcy Case"), now pending before the United States Bankruptcy Court for the District of Hawaii (the "Bankruptcy Court").

2. Cabebe is a resident of the State of Hawaii.

3. At the time her Bankruptcy Case was commenced, Cabebe owned s the real property home in which she resides, located at 98-510 Kaamilo Street in Aiea, in the City and County of Honolulu. Cabebe has sometimes described this property as being located at 98-510 Kaimu Loop in Aiea, in the City and County of Honolulu, which is the same property as that located at 98-510 Kaamilo Street.

4.3. Cabebe has sometimes listed her residence as being 98-510 Kaimu Loop in Aiea, in the City and County of Honolulu, which is the same property as that located at 98-510 Kaamilo Street.

4. At the time her Bankruptcy Case was commenced, Cabebe also owneds the real property located at 1604 Democrat Street in the City and County of Honolulu.

5. Upon information and belief, Mortgage Enterprise ("ME") is an unregistered partnership or joint venture between Cabebe, Henry Malinay, Edna

Franco, and Angelita Pasion, and possibly one or more other individuals, which operated in Hawaii, and whose principal place of business was located at 1604 Democrat Street in Honolulu.

6.    ME failed to register to do business in Hawaii, and failed to designate an authorized agent to accept service of process.

7.    Upon information and belief, Cabebe, Henry Malinay, Edna Franco, and Angelita Pasion were partners or joint venturers in ME, and service of process on any of these individuals constitutes proper service of process upon ME.

8.    Because of the illegal nature of ME's business, any entity which might have been formed to do conduct business as ME should be disregarded, and the individuals held accountable.

9.    Upon information and belief, Mortgage Enterprise Investments, also sometimes known as Mortgage Enterprises Investments (collectively "MEI"), is a tradename registered in Hawaii to Anthony Troy Williams, and according to the filing in the Business Registration Division of the Department of Commerce and Consumer Affairs, MEI was represented to be a Tennessee corporation.

10.    MEI is not a duly registered corporation in the State of Tennessee.

11.    Upon information and belief, MEI is an unregistered partnership between Cabebe, Anthony Troy Williams, Barbara Ann Williams, Henry Malinay, Edna Franco, Hep Guinn, and Mary Jean Castillo, and possibly one or more other individuals, which operated in Hawaii, and whose principal place of business was

4

originally located at 7 Waterfront Plaza, 500 Ala Moana Blvd, Suite 400 in Honolulu, and whose principal place of business subsequently moved to 1604 Democrat Street in Honolulu.

12.     MEI failed to register to do business in Hawaii, and failed to designate an authorized agent to accept service of process.

13.     Upon information and belief, Cabebe, Anthony Troy Williams, Barbara Ann Williams, Henry Malinay, Edna Franco, Hep Guinn, and Mary Jean Castillo were partners in MEI, and service of process on any of these individuals constitutes proper service of process upon MEI.

14.     Because of the illegal nature of ME's business, any entity which might have been formed to do conduct business as ME should be disregarded, and the individuals held accountable.

15.     Cabebe's last known address is P.O. Box 29386 Honolulu, HI 96820.

16.     Henry Malinay's last known address is 98-588 Kaimu Loop, Aiea, Hawaii, 96701.

17.     Edna Franco's last known address is HC 2 Box 6271, Keaau, HI, 96749.

18.     Angelita Pasion's last known address is 98-563 Kaimu Loop, Aiea, Hawaii, 96701.

19.     Anthony Troy Williams's last known address is [location to be filled in before the Complaint is filed].

5

20.    Barbara Ann Williams's last known address is 2306 Bluebonnet Drive, Killeen, Texas, 76549.

21.    Hep Guinn's last known address is 1617 Keeaumoku Street Apt 1006, Honolulu, Hawaii, 96822.

22.    Mary Jean Castillo's last known address is 812 Ekela Avenue, Honolulu, Hawaii, 96816.

5.23.    OCP is a "governmental unit" and a "creditor" as those terms are defined in 11 U.S.C. § 101, with police and regulatory powers created by HRS Chapter 487.

6.24.    Pursuant to HRS § 487-5, OCP is designated as consumer counsel for the State of Hawaii, and is empowered, among other things, to investigate reported or suspected violations of laws enacted and rules adopted for the purpose of consumer protection, and to enforce such laws and rules by bringing civil actions or proceedings.

7.25.    OCP is statutorily authorized by HRS § 487-14 to obtain restitution on behalf of consumers, and to either collect any such awards on behalf of consumers and process the payments through an OCP restitution account or assign awards to the respective consumers in whose favor restitution was awarded.

26.    OCP is statutorily authorized by HRS § 487-15 to obtain injunctive relief to enjoin any unlawful act or practice affecting consumers, trade or commerce.

U.S. Bankruptcy Court - Hawaii   #16-90011   Dkt # 51   Filed 01/04/17   Page 6 of 67

## **Jurisdiction**

~~8.~~27.  The Bankruptcy Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334 and 157, 11 U.S.C. §§ 1328(a)(2) and 523(a)(2)(A), and Fed. R. Bankr. P. Rule 7001.

~~9.~~28.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (I) and (O).

~~10.~~29. The Bankruptcy Court has both statutory and constitutional authority to enter a final judgment in this matter.  See, e.g., Deitz v. Ford (In re Deitz), 760 F.3d 1038 (9th Cir. July 28, 2014); Cai v. Shenzhen Smart–In Indus. Co., Ltd., 571 Fed.Appx. 580, 2014 WL 1647730 (9th Cir. April 25, 2014).

~~11.~~30. The Bankruptcy Court also has the power to award monetary and injunctive relief in favor of OCP.  See, e.g., Stanbrough v. Valle (In re Valle), 469 B.R. 35 (Bankr.D.Idaho 2012); Idaho v. Edwards (In re Edwards), 233 B.R. 461, 478–79 (Bankr.D.Idaho 1999).

~~12.~~31. To the extent the Bankruptcy Court may determine that this action or the claims made herein do not constitute a core proceeding, OCP consents to the entry of final orders or judgment of the Bankruptcy Court, subject to OCP's rights of appeal from any adverse final order or judgment of the Bankruptcy Court.

## **Venue**

~~13.~~32. Venue in the Bankruptcy Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

U.S. Bankruptcy Court - Hawaii   #16-90011   Dkt # 51   Filed  01/04/17   Page 7 of 67

## Statement of Facts

### (Allegations re Mortgage Enterprise Investments (MEI))

~~14.~~33. Cabebe has done business in Hawaii as ~~Mortgage Enterprise Investments, which is also sometimes known as Mortgage Enterprises Investments (collectively "~~MEI~~")~~.

~~15.~~34. MEI is a mortgage rescue fraud scam that has been operating in Hawaii in violation of applicable consumer protection statutes.

~~16.~~35. Cabebe offered MEI's services to consumers, being people who would use the service primarily for their own personal, family, or household purposes.

~~17.~~36. Cabebe represented to consumers that MEI was a mortgage reduction service that is guaranteed to cut in half a homeowner's mortgage loan balance, monthly mortgage payment, and mortgage loan term.

~~18.~~37. The promised mortgage reductions were supposed to be documented and made official through the filing of financing statements and/or new mortgages in the State of Hawaii Bureau of Conveyances ("BOC").

~~19.~~38. In cases where financing statements were used, Cabebe misled consumers into believing that successfully filed MEI financing statements equated to successfully reduced mortgages.

~~20.~~39. Cabebe used the MEI financing statements to help prevent consumers from discovering that the mortgage reduction service was a sham.

21.40.In cases where new mortgages were used, Cabebe misled consumers into believing that successfully filed MEI mortgages equated to successfully reduced original mortgages.

22.41.Cabebe used the MEI mortgages to help prevent consumers from discovering that the mortgage reduction service was a sham.

23.42.MEI had no way to deliver on its promise to consumers of reducing mortgages in the manner MEI claimed.

24.43.At all times Cabebe operated MEI with the intent and purpose of defrauding consumers.

25.44.Cabebe had no means or intention to deliver on the MEI promise of cutting mortgage loan balances by one-half, and Cabebe knew she had no means or intention to deliver on the MEI promise of cutting mortgage loan balances by one-half.

26.45.Cabebe doing business as MEI did not reduce clients' mortgage loan balances by one-half.

27.46.Cabebe doing business as MEI had no intention of reducing clients' mortgage loan balances by one-half.

28.47.Cabebe doing business as MEI made no lawful attempt to reduce clients' mortgage loan balances by one-half.

29.48.Cabebe ran MEI with the assistance of Anthony Troy Williams ("Williams"), Barbara Ann Williams, Henry Malinay, Edna Franco, Hep Guinn, Mary Jean Castillo, and one or more other individuals.

30.49.Cabebe claimed that MEI was overseen by the Common Law Office of America ("CLOA"), for which she claimed she served as a deputy private attorney general and Williams served as a private attorney general.

31.50.Cabebe distributed her business card to consumers, representing herself to be a deputy private attorney general. A true and correct copy of Cabebe's business card distributed to consumers is attached hereto as Exhibit 1.

32.51.Consumers being solicited the MEI service were instructed to visit CLOA's website to view the profiles of Cabebe and Williams. A true and correct printout of the personal profiles of Cabebe and Williams made available to consumers on CLOA's website is attached as Exhibit 2.

33.52.Cabebe created, and distributed to prospective new clients, standard MEI forms that were used to mislead consumers into believing the mortgage reduction service offered by MEI was legitimate. The standard MEI forms included an "MEI Application" or "Customer Information" sheet, an MEI "Homeowner Service Guarantee Agreement," a "Statutory Short Form Power of Attorney," a "Foreclosure Disclosure Terms and Conditions" sheet, an "MEI Insurance and Tax Disclaimer" sheet, and some variation of the MEI checklist describing documents to be provided by consumers and method of payment. True and correct copies of the

10

foregoing standard MEI forms are attached hereto respectively as <u>Exhibits 3 through 8</u>.

~~34.~~53.The standard MEI "Homeowner Service Guarantee Agreement" sheet distributed to potential new clients falsely provides that MEI guarantees its ability to both secure a monthly mortgage service payment that is one-half of the homeowner's current mortgage payment and reduce the homeowner's current mortgage loan pay-off term by one-half.

~~35.~~54.Cabebe knew the guarantee was false, since she knew MEI had never successfully obtained a mortgage reduction.

~~36.~~55.Even if Cabebe was not initially aware of MEI's inability to successfully obtain a mortgage reduction, Cabebe certainly acquired that knowledge early on in the scheme, and at a time when Cabebe certainly had knowledge of the fraud, Cabebe thereafter did nothing to notify past injured consumers or otherwise remedy their claims, and Cabebe thereafter continued with the scheme with the intent and for the purpose of contracting with new prospective clients and defrauding those consumers.

~~37.~~56.The standard MEI "Homeowner Service Guarantee Agreement" sheet distributed to potential new clients further falsely provides that MEI "will <u>fully</u> refund" any homeowner if MEI fails to secure a mortgage service payment that is one-half of the homeowner's current mortgage payment.

U.S. Bankruptcy Court - Hawaii   #16-90011   Dkt # 51   Filed  01/04/17   Page 11 of 67

38.57. MEI knew or should have known that every client was likely to seek a full refund due to MEI's inability to deliver the results promised to its clients.

39.58. Given the reasonable expectation and near certainty of massive refunds having to be paid out, large cash reserves should have been set aside to satisfy anticipated consumer demand for refunds.

40.59. Upon information and belief, no cash reserves were set aside to satisfy requests for refunds.

41.60. The lack of large cash reserves from which to satisfy requests for refunds is evidence of fraud, since either MEI had no intention of honoring its refund guarantee, or MEI intended to pay refunds using monies collected from newer clients of the mortgage reduction service, much like a pyramid scheme or Ponzi scheme, and that would be fraudulent since MEI had no way to deliver the promised services to the newer clients.

42.61. Upon information and belief, at no time has MEI ever honored its guarantee to fully refund a client for whom MEI fails to provide the promised results, whether that be the failure to cut the client's mortgage loan balance in half, or the failure to cut the client's monthly mortgage loan payment in half, or the failure to cut the client's mortgage term in half. None of these results were ever obtained by MEI on behalf of any consumer.

43.62. Upon information and belief, because MEI had no way to deliver on the promises made to its clients, and had no cash reserves set aside to honor refund claims, MEI had no intention of issuing full refunds.

44.63. The standard MEI "Homeowner Service Guarantee Agreement" sheet distributed to potential new clients falsely provides that because of the MEI refund guarantee, there is "no risk" to the consumer if MEI is unsuccessful in reducing a client's current mortgage loan payment by one-half.

45.64. Even if MEI had every intention of making full refunds, the risk of its own insolvency would have created some risk to consumers.

46.65. The standard MEI "Foreclosure Disclosure Terms and Conditions" sheet distributed to potential new clients falsely indicates that MEI has a "rock solid proven method" of reducing mortgages that has "yielded a 100% success rate" that allowed the company to stand firmly behind its guarantee.

47.66. Upon information and belief, MEI never succeeded in reducing by one-half even one client's mortgage through its supposed "proven method" of filing financing statements in the BOC.

48.67. Upon information and belief, MEI has a 100% failure rate in reducing mortgages by one-half by any lawful means.

49.68. The MEI mortgage reduction scheme was perpetuated through its phony financing statements, which were standard in their treatment of the debtor-creditor relationship.

U.S. Bankruptcy Court - Hawaii  #16-90011  Dkt # 51  Filed  01/04/17  Page 13 of 67

50.69. One version of the standard MEI financing statement supposedly provides notice to the world that the homeowner, as debtor, has given to MEI, as creditor, a security interest in certain collateral, being everything the debtor owns, (i.e., the homeowner purports to grant MEI a lien against the homeowner's real and personal property).

51.70. A second version of the standard MEI financing statement supposedly provides notice to the world that the homeowner, as debtor, has given to the homeowner, as creditor, a security interest in certain collateral, being everything the debtor owns, (i.e., the homeowner purports to grant himself or herself a lien against the homeowner's real and personal property).

52.71. Both versions of the standard MEI financing statement include language that "any" mortgage against the subject property is "discharged," giving the false appearance that the filing of the MEI financing statement discharges prior mortgages recorded against the property.

53.72. The frivolous MEI financing statements filed in the BOC by Cabebe were used as a device to mislead consumers into thinking that the mortgage reduction had been successfully implemented.

54.73. The MEI financing statements filed in the BOC were not supported by a loan or any other consideration and are bogus and void.

55.74. The MEI financing statement provided to consumers Florencia and Ernesto Pasalo is typical of the MEI financing statements filed in the BOC and

provided to MEI clients.  Attached hereto as <u>Exhibit 9</u> is a true and correct copy of the MEI financing statement prepared and filed in the BOC on behalf of Florencia and Ernesto Pasalo.

~~56.~~75. All clients of MEI were supposed to have been provided with a MEI financing statement identical or substantially similar to the form attached hereto as <u>Exhibit 9</u>, except that the real property description would change to reflect the actual real property owned by a particular client.

~~57.~~76. The financing statement filed by MEI in the BOC on behalf of Florencia and Ernesto Pasalo provides that "ANY MORTGAGE UNDER EXHIBIT 'A' ARE DISCHARGED."

~~58.~~77. The financing statement filed by MEI in the BOC on behalf of Florencia and Ernesto Pasalo is a document that confers no legal benefit upon the consumers.

~~59.~~78. The financing statement filed by MEI in the BOC on behalf of Florencia and Ernesto Pasalo misrepresents to the entire world the true status of the mortgage liens against their property.

~~60.~~79. The financing statement filed by MEI in the BOC on behalf of Florencia and Ernesto Pasalo is frivolous, fictitious, meaningless, bogus, a phony, and a sham, used to perpetrate a fraud on the Pasalos.

~~61.~~80. Financing statements substantially similar to <u>Exhibit 9</u> were filed by MEI in the BOC and similarly used to perpetuate a fraud on other consumer-clients of MEI.

U.S. Bankruptcy Court - Hawaii   #16-90011   Dkt # 51   Filed  01/04/17   Page 15 of 67

62.81. To the extent that a recorded MEI financing statement appears to be an instrument used in an attempt to discharge or otherwise undermine the force or effect of any mortgages recorded against a particular real property, the financing statement may be viewed as a device to perpetrate a fraud on mortgagees and other legitimate lienholders.

63.82. Far from benefitting homeowners, the MEI mortgage reduction service exposed homeowners to litigation, especially foreclosure actions.

64.83. The MEI mortgage reduction service also exposed homeowners to litigation based on the appearance that homeowners may have colluded with MEI to commit fraud by seeking to discharge the liens of legitimate creditors, and by improperly encumbering the property used to collateralize the liens of legitimate creditors.

65.84. The MEI mortgage reduction scheme was also perpetuated by the making and recordation of new mortgages, which supposedly replaced the original mortgages, but were made in favor of MEI on terms consistent with the mortgage reduction as promised by MEI.

66.85. Although the MEI mortgage gave the appearance that the balance of the consumer's original mortgage had been cut in half, the MEI mortgage had no legal effect upon the original mortgage, and instead gives the appearance that the consumer took out an additional mortgage, and instead of having half the mortgage,

U.S. Bankruptcy Court - Hawaii   #16-90011   Dkt # 51   Filed  01/04/17   Page 16 of 67

the MEI mortgage makes it appear as though the consumer is liable for one-and-one-half times the original debt.

67.86. In some instances, MEI would simply refer to the new mortgage in correspondence to the client, and direct that payments be made to MEI, but MEI would not actually record its mortgage. Attached hereto as Exhibit 10 are true and correct copies of correspondence representative of the type of correspondence some MEI clients received with regard to the instructions to make future mortgage payments to MEI, even though MEI did not actually record a mortgage in its favor.

68.87. In other instances, MEI would record in the BOC a new mortgage made in its favor, and direct the client to make future payments to MEI based on its mortgage. Attached hereto as Exhibit 11 is a true and correct copy of an MEI mortgage filed with the BOC representative of the type of MEI mortgage some clients were given, for which those clients were instructed to make future mortgage payments to MEI and not to their true, legitimate lender or servicer.

69.88. The MEI mortgages filed in the BOC were not supported by a loan or any other consideration and are bogus and void.

70.89. In some instances, to further mislead consumers into believing the MEI mortgages were legitimate, MEI is known to have had its clients sign promissory notes in favor of MEI, even though the notes were not supported by a loan or any other consideration and are bogus and void. Attached hereto as Exhibit 12 is a true and correct copy of an MEI promissory note representative of the type of MEI

17

promissory notes some clients were given, for which those clients were instructed to make future mortgage payments to MEI and not to their true, legitimate lender or servicer.

71.90. Consumers signed up and paid for MEI's services based upon Cabebe's representations about MEI.

72.91. The consumers' reliance upon Cabebe's representations about MEI was justifiable under the facts and circumstances.

73.92. Cabebe targeted victims who were part of the Filipino community, spoke Ilocano, had little formal education, and only learned English as a second language.

74.93. Many of the people that Cabebe persuaded to become clients of MEI have at least some difficulty reading, writing, speaking and understanding English, particularly with respect to matters of business and personal finance.

75.94. In describing MEI's mortgage reduction service, Cabebe told prospective new clients that their mortgages (technically the mortgage loan balances) would be cut in half by MEI.

76.95. The paperwork lent credibility to what Cabebe told consumers.

77.96. What Cabebe told consumers about MEI was consistent with the representations in the MEI standard forms, such as its 100% success rate in obtaining mortgage reductions, and there being no risk, and the guarantee of full refunds.

78.97. Cabebe distributed the MEI standard forms to consumers knowing that they had no reason to question the representations contained in the papers.

79.98. Having these representations in writing helped to legitimize whatever was said verbally to consumers to describe the mortgage reduction service offered by MEI.

80.99. Cabebe knew the representations she was making to consumers about MEI were false.

81.100. Consumers believed Cabebe doing business as MEI could cut their mortgages or mortgage loan balances in half based upon the false representations of Cabebe and the false representations in the MEI standard forms.

82.101. Consumers were told that MEI's services would be provided by or overseen by an attorney affiliated with CLOA.

83.102. "Law Office" was part of CLOA's name to further the impression that the mortgage reduction service was legitimate.

84.103. "Law Office" was part of CLOA's name by design to give the appearance that CLOA was an office of attorneys licensed with the Hawaii bar to practice law.

85.104. The mere fact that CLOA's name included "Law Office" bolstered the appearance that MEI was a legitimate and legal service.

86.105. The false appearance of attorney oversight of MEI was bolstered by Cabebe holding herself out as a deputy private attorney general and by Williams

19

holding himself out as a private attorney general, both of which are fictitious designations that are in no way reflective of the qualifications or background of Cabebe or Williams.

87.106.     The involvement and oversight of alleged attorneys, and the use of legal-looking forms, all contributed to the impression that MEI was legitimate.

88.107.     CLOA rented space for its Honolulu office at Restaurant Row, located in downtown Honolulu and featuring newer buildings and modern architectural design.

89.108.     CLOA helped its image by operating from Restaurant Row because it is generally recognized as a prominent locale in a high rent district catering to many high profile tenants, including one very prominent law firm.

90.109.     Also contributing to the believability of MEI was the use of notary publics for the notarization of client signatures on MEI's paperwork.

91.110.     Cabebe was such a notary, and notarized nearly all of the MEI documents notarized on Oahu.

92.111.     Cabebe has falsely claimed over the years that her notary books and seal have been lost and/or stolen as part of an ongoing effort to conceal the fraudulent MEI scheme.

93.112.     As Cabebe continued to actively seek and obtain new MEI clients, the volume of business generated helped to create a trust factor, as many of

the newer consumers knew of someone that had signed up for MEI's services just weeks earlier.

94.113. As more and more clients signed up for MEI services, MEI prepared and filed more and more financing statements and/or mortgages in the BOC.

95.114. MEI maintained the appearance of providing a legitimate legal service by providing consumers with filed and official-looking mortgages and/or financing statements which, based on how the mortgage reduction service had been described, gave the false appearance as though the mortgages and/or financing statements may have been reviewed and approved by the State of Hawaii as a prerequisite to their filing.

96.115. While the BOC does not reject submitted filings, the typical MEI client is not likely to know that, or to ever learn that, since all of the MEI filings at the BOC were handled by MEI.

97.116. While it may seem illogical that the BOC would allow its records to be flooded with bogus documents like MEI's mortgages and financing statements, the BOC maintains a no-bounce rule.

98.117. Consumers were told vaguely that the mortgage reduction service was accomplished by the filing of the MEI mortgage and/or the MEI financing statement in the BOC, and one or both documents would in fact be filed,

and file-stamped copies were provided to the clients, who were left with the impression that the service seemed to work just as Cabebe said it would.

~~99.~~118.    Cabebe collected advance payments from consumers for MEI's services.  The precise amounts varied, but consumers each typically paid several thousand dollars up front for the MEI service, and additionally, many consumers thereafter each typically paid thousands of dollars on a monthly basis in mortgage payments made payable to MEI toward MEI's alleged mortgage.

~~100.~~119.    Cabebe typically collected from consumers one or more checks made payable to MEI, one or more checks made payable to cash, and cash as part of the payment for the alleged mortgage reduction service.

~~101.~~120.    Cabebe asked for and collected from consumers the consumers' deeds to their real property so that MEI would have the correct real property descriptions to attach to the MEI financing statements and mortgages.

~~102.~~121.    Cabebe later provided consumers with a copy of the MEI financing statements filed on their behalf in the BOC.

~~103.~~122.    Providing consumers with the MEI financing statements filed on their behalf contributed to the false appearance that MEI's services were effective.

~~104.~~123.    Cabebe told consumers to stop paying their mortgages or loans secured by their mortgages.

~~105.~~124.    Cabebe told consumers to stop paying their mortgages to give the appearance that MEI's services were effective.

106.125.     It was justifiable for MEI clients to rely on Cabebe's instructions because their old mortgages were supposedly no longer good thanks to the mortgage reduction service, so it seemed consistent that payments on the old mortgages would no longer be required.

107.126.     The sense of gratification MEI clients felt was attributed to their belief that they no longer had to make the payments required under their original mortgages, which helped fuel the popularity of MEI, leading to more clients and more money for Cabebe.

108.127.     Any sense of gratification felt by MEI clients was false and short-lived.

109.128.     Clients of MEI have subsequently learned from their lenders or servicers that MEI failed to cut their mortgage loan balances in half.

110.129.     Consumers feel cheated as a result of having paid for a mortgage reduction service that failed to reduce their mortgage loan balances.

111.130.     Consumers also feel cheated after learning the alleged 100% success rate was a lie, they were at risk, the guarantee of a full refund was another lie, and now that the Bankruptcy Court has been asked to determine that MEI is a fraudulent scheme, no one wants to claim accept responsibility or otherwise he held accountable for the actions of MEI.

112.131.     Consumers were cheated as a result of having paid for a service that failed to reduce their mortgage loan balances.

U.S. Bankruptcy Court - Hawaii   #16-90011   Dkt # 51   Filed  01/04/17   Page 23 of 67

113.132.    Cabebe has not refunded to consumers any of the money paid to MEI for MEI's alleged services.

114.133.    MEI clients have also failed to get refunds from anyone else acting or purporting to act on behalf of MEI, including Williams.

115.134.    Upon information and belief, none of the money paid by consumers for the MEI mortgage reduction service has been refunded to them.

116.135.    At the time consumers paid for the mortgage reduction service, Cabebe did not inform them that the service would not work.

117.136.    The MEI mortgage reduction service does not work.

118.137.    MEI is a fraud.

119.138.    Consumers who were victimized because of Cabebe's mortgage rescue scams are having to declare bankruptcy as a means to find relief from the bogus filings encumbering their real and personal property.  In re Dingle, Case No. 15-01459 (pending Chapter 13), In re Madamba, Case No. 15-01473 (pending Chapter 13), and In re Maramag, Case No. 14-00625 (pending Chapter 13), are all cases filed with the Bankruptcy Court due to complications involving the bogus MEI financing statements and/or bogus MEI mortgages filed by Cabebe.  The bogus MEI documents also encumber Cabebe's own properties, but Cabebe failed to disclose them.

**(Allegations re Mortgage Enterprise (ME))**

~~120.~~139.     Cabebe has also done business in Hawaii as ~~Mortgage Enterprise~~ ~~("ME")~~.

~~121.~~140.     ME is a mortgage rescue fraud scam that was operating in Hawaii in violation of applicable consumer protection statutes.

~~122.~~141.     Cabebe offered ME's services to consumers, being people who would use the service primarily for their own personal, family, or household purposes.

~~123.~~142.     Cabebe represented to consumers that ME was a mortgage reduction service that is guaranteed to cut in half a homeowner's mortgage loan balance, monthly mortgage payment, and mortgage loan term.

~~124.~~143.     The promised mortgage reductions were supposed to be documented and made official through the filing of financing statements in the BOC.

~~125.~~144.     In cases where financing statements were used, Cabebe misled consumers into believing that successfully filed ME financing statements equated to successfully reduced mortgages.

~~126.~~145.     Cabebe used the ME financing statements to help prevent consumers from discovering that the mortgage reduction service was a sham.

~~127.~~146.     ME had no way to deliver on its promise to consumers of reducing mortgages in the manner ME claimed.

128.147.    At all times Cabebe operated ME with the intent and purpose of defrauding consumers.

129.148.    Cabebe had no means or intention to deliver on the ME promise of cutting mortgage loan balances by one-half, and Cabebe knew she had no means or intention to deliver on the ME promise of cutting mortgage loan balances by one-half.

130.149.    Cabebe doing business as ME did not reduce clients' mortgage loan balances by one-half.

131.150.    Cabebe doing business as ME had no intention of reducing clients' mortgage loan balances by one-half.

132.151.    Cabebe doing business as ME made no lawful attempt to reduce clients' mortgage loan balances by one-half.

133.152.    Cabebe ran ME with the assistance of Henry Malinay, Edna Franco and Angelita Pasion, and one or more other individuals.

134.153.    Cabebe took the standard MEI business forms to create ME business forms that, except in name, are virtually identical in appearance and content to the MEI forms, and Cabebe distributed the forms to prospective new clients.

135.154.    The standard ME forms included an "ME Application" or "Customer Information" sheet, an ME "Homeowner Service Guarantee Agreement," a "Statutory Short Form Power of Attorney," a "Foreclosure Disclosure Terms and Conditions" sheet, an "ME Insurance and Tax Disclaimer" sheet, and

26

some variation of the ME checklist describing documents to be provided and method of payment. True and correct copies of the foregoing standard ME forms are attached hereto respectively as <u>Exhibits 13 through 18</u>.

~~136.~~155.     The standard ME "Homeowner Service Guarantee Agreement" sheet distributed to potential new clients falsely provides that ME guarantees its ability to both secure a monthly mortgage service payment that is one-half of the homeowner's current mortgage payment and to reduce the homeowner's current mortgage loan pay-off term by one-half.

~~137.~~156.     Cabebe knew the guarantee was false, since she knew ME had never successfully obtained a mortgage reduction.

~~138.~~157.     Even if Cabebe was not initially aware of ME's inability to successfully obtain a mortgage reduction, Cabebe certainly acquired that knowledge early on in the scheme, and at a time when Cabebe certainly had knowledge of the fraud, Cabebe thereafter did nothing to notify past injured consumers or otherwise remedy their claims, and Cabebe thereafter continued with the scheme with the intent and for the purpose of contracting with new prospective clients and defrauding those consumers.

~~139.~~158.     The standard ME "Homeowner Service Guarantee Agreement" sheet distributed to potential new clients further falsely provides that ME "will <u>fully</u> refund" any homeowner if ME fails to secure a mortgage service payment that is one-half of the homeowner's current mortgage payment.

~~140.~~159.   ME knew or should have known that every client was likely to seek a full refund due to ME's inability to deliver the results promised to its clients.

~~141.~~160.   Given the reasonable expectation and near certainty of massive refunds having to be paid out, large cash reserves should have been set aside to satisfy anticipated consumer demand for refunds.

~~142.~~161.   Upon information and belief, no cash reserves were set aside to satisfy requests for refunds.

~~143.~~162.   The lack of large cash reserves from which to satisfy requests for refunds is evidence of fraud, since either ME had no intention of honoring its refund guarantee, or ME intended to pay refunds using monies collected from newer clients of the mortgage reduction service, much like a pyramid scheme or Ponzi scheme, and that would be fraudulent since ME had no way to deliver the promised services to the newer clients.

~~144.~~163.   Upon information and belief, at no time has ME ever honored its guarantee to fully refund a client for whom ME fails to provide the promised results, whether that be the failure to cut the client's mortgage loan balance in half, or the failure to cut the client's monthly mortgage loan payment in half, or the failure to cut the client's mortgage term in half.  None of these results were ever obtained by ME on behalf of any consumer.

U.S. Bankruptcy Court - Hawaii   #16-90011   Dkt # 51   Filed  01/04/17   Page 28 of 67

145.164.    Upon information and belief, because ME had no way to deliver on the promises made to its clients, and had no cash reserves set aside to honor refund claims, ME had no intention of issuing full refunds.

146.165.    The standard ME "Homeowner Service Guarantee Agreement" sheet distributed to potential new clients falsely provides that because of the ME refund guarantee, there is "no risk" to the consumer if ME is unsuccessful in reducing a client's current mortgage loan payment by one-half.

147.166.    Even if ME had every intention of making full refunds, the risk of its own insolvency would have created some risk to consumers.

148.167.    The standard ME "Foreclosure Disclosure Terms and Conditions" sheet distributed to potential new clients falsely indicates that ME has a "rock solid proven method" of reducing mortgages that has "yielded a 100% success rate" that allowed the company to stand firmly behind its guarantee.

149.168.    Upon information and belief, ME never succeeded in reducing by one-half even one client's mortgage through its supposed "proven method" of filing financing statements in the BOC.

150.169.    Upon information and belief, ME has a 100% failure rate in reducing mortgages by one-half by any lawful means.

151.170.    The ME mortgage reduction scheme was perpetuated through its phony financing statements, which were standard in their treatment of the debtor-creditor relationship.

U.S. Bankruptcy Court - Hawaii   #16-90011   Dkt # 51   Filed  01/04/17   Page 29 of 67

152.171.   The standard ME financing statement supposedly provides notice to the world that the homeowner, as debtor, has given to the homeowner, as creditor, a security interest in certain collateral, being everything the debtor owns, (i.e., the homeowner purports to grant himself or herself a lien against the homeowner's real and personal property).

153.172.   The standard ME financing statement includes language that "any" mortgage against the subject property is "discharged," giving the false appearance that the filing of the ME financing statement not only affects the property but somehow discharges any prior mortgages recorded against the property.

154.173.   The frivolous ME financing statements filed in the BOC by Cabebe were used as a device to mislead consumers into thinking that the mortgage reduction had been successfully implemented.

155.174.   The ME financing statements filed in the BOC were not supported by a loan or any other consideration and are bogus and void.

156.175.   Unlike MEI, the ME mortgage reduction scheme did not include the filing of new mortgages.

157.176.   The ME financing statement provided to consumers Felicitas and Benjie Pasion is typical of the ME financing statements filed in the BOC and provided to ME clients.  Attached hereto as <u>Exhibit 19</u> is a true and correct copy of the ME financing statement prepared and filed in the BOC on behalf of Felicitas and Benjie Pasion.

U.S. Bankruptcy Court - Hawaii   #16-90011   Dkt # 51   Filed  01/04/17   Page 30 of 67

158.177.    All clients of ME were supposed to have been provided with a ME financing statement identical or substantially similar to the form attached hereto as Exhibit 19, except that the real property description would change to reflect the actual real property owned by a particular client.

159.178.    The financing statement filed by ME in the BOC on behalf of Felicitas and Benjie Pasion provides that "ANY MORTGAGE UNDER EXHIBIT A IS DISCHARGED."

160.179.    The financing statement filed by ME in the BOC on behalf of Felicitas and Benjie Pasion is a document that confers no legal benefit upon the consumers.

161.180.    The financing statement filed by ME in the BOC on behalf of Felicitas and Benjie Pasion misrepresents to the entire world the true status of the mortgage liens against their property.

162.181.    The financing statement filed by ME in the BOC on behalf of Felicitas and Benjie Pasion is frivolous, fictitious, meaningless, bogus, a phony, and a sham, used to perpetrate a fraud on the Pasions.

163.182.    Financing statements substantially similar to Exhibit 19 were filed by ME in the BOC and similarly used to perpetuate a fraud on other consumer-clients of ME.

164.183.    To the extent that a recorded ME financing statement appears to be an instrument used in an attempt to discharge or otherwise undermine the force

31

or effect of any mortgages recorded against a particular real property, the financing statement may be viewed as a device to perpetrate a fraud on mortgagees and other legitimate lienholders.

165.184.    Far from benefitting homeowners, the ME mortgage reduction service exposed homeowners to litigation, especially foreclosure actions.

166.185.    The ME mortgage reduction service also exposed homeowners to litigation based on the appearance that homeowners may have colluded with ME to commit fraud by seeking to discharge the liens of legitimate creditors, and by improperly encumbering the property used to collateralize the liens of legitimate creditors.

167.186.    Consumers signed up and paid for ME's services based upon Cabebe's representations about ME.

168.187.    The consumers' reliance upon Cabebe's representations about ME was justifiable under the facts and circumstances.

169.188.    Cabebe targeted victims who were part of the Filipino community, spoke Ilocano, had little formal education, and only learned English as a second language.

170.189.    Many of the people that Cabebe persuaded to become clients of ME have at least some difficulty reading, writing, speaking and understanding English, particularly with respect to matters of business and personal finance.

171.190.    In describing ME's mortgage reduction service, Cabebe told prospective new clients that their mortgages (technically the mortgage loan balances) would be cut in half by ME.

172.191.    The paperwork lent credibility to what Cabebe told consumers.

173.192.    What Cabebe told consumers about ME was consistent with the representations in the ME standard forms, such as its 100% success rate in obtaining mortgage reductions, and there being no risk, and the guarantee of full refunds.

174.193.    Cabebe distributed the ME standard forms to consumers knowing that they had no reason to question the representations contained in the papers.

175.194.    Having these representations in writing helped to legitimize whatever was said verbally to consumers to describe the mortgage reduction service offered by ME.

176.195.    Cabebe knew the representations she was making to consumers about ME were false.

177.196.    Consumers believed Cabebe doing business as ME could cut their mortgages or mortgage loan balances in half based upon the false representations of Cabebe and the false representations in the ME standard forms.

178.197.    The use of legal-looking forms contributed to the impression that ME was legitimate.

U.S. Bankruptcy Court - Hawaii   #16-90011   Dkt # 51   Filed  01/04/17   Page 33 of 67

179.198.     ME operated from 1604 Democrat Street in Kalihi, a property owned by Cabebe.

180.199.     Also contributing to the believability of ME was the use of notary publics for the notarization of client signatures on ME's paperwork.

181.200.     Cabebe was such a notary, and notarized nearly all of the ME documents notarized on Oahu.

182.201.     Cabebe has falsely claimed over the years that her notary books and seal have been lost and/or stolen as part of an ongoing effort to conceal the fraudulent ME scheme.

183.202.     As Cabebe continued to actively seek and obtain new ME clients, the volume of business generated helped to create a trust factor, as many of the newer consumers knew of someone that had signed up for ME's services just weeks earlier.

184.203.     As more and more clients signed up for ME services, ME prepared and filed more and more financing statements in the BOC.

185.204.     ME maintained the appearance of providing a legitimate legal service by providing consumers with filed and official-looking financing statements which, based on how the mortgage reduction had been described, gave the false appearance as though the financing statements may have been reviewed and approved by the State of Hawaii as a prerequisite to their filing.

186.205.    While the BOC does not reject submitted filings, the typical ME client is not likely to know that, or to ever learn that, since all of the ME filings at the BOC were handled by ME.

187.206.    While it may seem illogical that the BOC would allow its records to be flooded with bogus documents like ME's mortgages and financing statements, the BOC maintains a no-bounce rule.

188.207.    Consumers were told vaguely that the mortgage reduction service was accomplished by the filing of the ME financing statements in the BOC, and the documents would in fact be filed, and file-stamped copies were provided to the clients, who were left with the impression that the service seemed to work just as Cabebe said it would.

189.208.    Cabebe collected advance payments from consumers for ME's services.  The precise amounts varied, but consumers each typically paid several thousand dollars up front for the ME service.

190.209.    Cabebe typically collected from consumers one or more checks made payable to ME, one or more checks made payable to cash, and cash as part of the payment for the alleged mortgage reduction service.

191.210.    Cabebe asked for and collected from consumers the consumers' deeds so that ME would have the correct real property descriptions to attach to the ME financing statements.

192.211.    Cabebe later provided consumers with a copy of the financing statements filed on their behalf in the BOC.

193.212.    Providing consumers with the ME financing statements filed on their behalf contributed to the false appearance that ME's services were effective.

194.213.    Cabebe told consumers to stop paying their mortgages or loans secured by their mortgages.

195.214.    Cabebe told consumers to stop paying their mortgages to give the appearance that ME's services were effective.

196.215.    It was justifiable for ME clients to rely on Cabebe's instructions because their old mortgages were supposedly no longer good thanks to the mortgage reduction service, so it seemed consistent that payments on the old mortgages would no longer be required.

197.216.    The sense of gratification ME clients felt was attributed to their belief that they no longer had to make the payments required under their original mortgages, which helped fuel the popularity of ME, leading to more clients and more money for Cabebe.

198.217.    Any sense of gratification felt by ME clients was false and short-lived.

199.218.    Clients of ME have subsequently learned from their lenders or servicers that ME failed to cut their mortgage loan balances in half.

200.219.    Consumers feel cheated as a result of having paid for a mortgage reduction service that failed to reduce their mortgage loan balances.

201.220.    Consumers also feel cheated after learning the alleged 100% success rate was a lie, they were at risk, the guarantee of a full refund was another lie, and now that the Bankruptcy Court has been asked to determine that ME is a fraudulent scheme, no one wants to accept responsibility or otherwise be held accountable for the actions of ME.

202.221.    Consumers were cheated as a result of having paid for a service that failed to reduce their mortgage loan balances.

203.222.    Cabebe has not refunded to consumers any of the money paid to ME for ME's alleged services.

204.223.    ME clients have also failed to get refunds from anyone else acting or purporting to act on behalf of ME, including Henry Malinay, Edna Franco and Angelita Pasion.

205.224.    Upon information and belief, none of the money paid by consumers paid for the ME mortgage reduction service has been refunded to them, except for monies which may have been paid out by OCP as part of its ongoing effort to remedy the fraud.

206.225.    At the time consumers paid for the mortgage reduction service, Cabebe did not inform them that the service would not work.

207.226.    The ME mortgage reduction service does not work.

208.227.    ME is a fraud.

209.228.    Clients of ME provided OCP with copies of their processed checks made payable to ME.  Some of these checks were deposited into bank accounts in the name of ME at Wells Fargo, JPMorganChase, and Union Bank.

210.229.    Cabebe is a signatory on the ME bank accounts as Wells Fargo, JPMorganChase, and Union Bank.

211.230.    OCP subpoenaed the records of the ME account at Wells Fargo and confirmed that Cabebe is a signatory on the account, and that she represented to the bank that she was a co-owner of ME.

212.231.    OCP subpoenaed the records of the ME account at JPMorganChase and confirmed that Cabebe is a signatory on the account, and that she represented to the bank that she was a co-owner of ME.

213.232.    OCP subpoenaed the records of Cabebe's local bank account at American Savings, and discovered checks deposited into the account made by Cabebe to herself on the ME account at Union Bank, thereby confirming that Cabebe is a signatory on the ME Union Bank account.

214.233.    Upon information be belief, Cabebe represented to Union Bank that she was a co-owner of ME.

### (Allegations Common to both MEI and ME)

215.234.    The MEI and ME standard forms are misleading by design.

216.235.　　Because there was no legitimate mortgage reduction service for consumers to purchase, all of the standard forms provided to prospective new clients by or on behalf of MEI or ME were false.

217.236.　　The false representations contained in the MEI and ME standard forms were intended to increase the number of clients signing up and paying for the bogus mortgage reduction service.

218.237.　　There was no legitimate mortgage reduction service for consumers to purchase from either MEI or ME, so essentially everything shared with consumers about MEI or ME was false.

219.238.　　Omissions of the truth also contributed to the false impression of MEI and ME that was conveyed to the public.

220.239.　　Every time Cabebe took any action concerning MEI or ME, whether it be describing how the mortgage reduction service was guaranteed to work, distributing the standard forms, notarizing the standard forms, collecting payments, or recording documents at the BOC, distributing the recorded documents, or instructing consumers not to pay on their original mortgages, Cabebe was acting in furtherance of the fraud.

221.240.　　Every time one of Cabebe's collaborators and/or co-conspirators took any action concerning MEI or ME, whether it be describing how the mortgage reduction service was guaranteed to work, distributing the standard forms, collecting payments, or recording documents at the BOC, distributing the recorded documents,

39

or instructing consumers not to pay on their original mortgages, the collaborator and/or co-conspirator acted in furtherance of the fraud, which conduct is imputed to Cabebe.

222.241.    Most consumers were current on their mortgages, and were under the protection of the MARS Rule and HRS Chapter 480 at the time when they signed up and paid for the services offered by MEI or ME, and a non-exhaustive list of some of the ways in which such consumers have been injured by MEI or ME includes: (1) being burdened with unlawful and misleading documents recorded against their real properties in the form of MEI financing statements, MEI mortgages and/or ME financing statements, (2) being out of pocket for the money paid for a mortgage reduction service that conferred no benefit upon them, (3) being assessed a higher default rate of interest on their mortgage loan, and/or being assessed late charges and attorneys' fees and costs, (4) having lower credit scores as a result of having stopped making mortgage payments based upon the advice and instruction of Cabebe, (5) incurring additional costs for assistance and advice to cure their delinquencies, (6) incurring penalties and taxes when tapping retirement accounts for the funds necessary to cure their delinquencies, (7) being unnecessarily exposed to the risk of foreclosure, (8) being unnecessarily exposed to the risk that a lender or servicer may allege collusion to defraud, and (9) suffering from the stress and worry associated with losing their home to foreclosure, particularly the fear of being displaced from their homes along with all household members and all of their personal possessions.

40

223.242.    Some consumers were considered to be owners of "distressed property" under HRS § 480E-2, and were under the protection of the MARS Rule and HRS Chapters 480 and 480E at the time when they signed up and paid for the services of MEI or ME, and a non-exhaustive list of some of the ways in which such consumers have been injured includes: (1) being burdened with unlawful and misleading documents recorded against their real properties in the form of MEI financing statements, MEI mortgages and/or ME financing statements, (2) being out of pocket for the money paid for a mortgage reduction service that conferred no benefit upon them, (3) having less time to find a legitimate way to avoid foreclosure, and thus being at increased risk of foreclosure, (4) incurring additional costs for assistance and advice to cure their delinquencies, (5) facing an even larger delinquent balance to have to try and remedy in order to avoid foreclosure, and (6) being unnecessarily exposed to the risk that a lender or servicer may allege collusion to defraud.

224.243.    Relief under the MARS Rule and HRS Chapter 480 is available to those consumers who were current on their mortgages at the time when they signed up and paid for the services of MEI or ME.

225.244.    Relief under the MARS Rule and HRS Chapters 480 and 480E is available to those consumers who were delinquent on their mortgages by at least 60 days, or otherwise fell under the protection of HRS Chapter 480E, at the time when they signed up and paid for the services of MEI or ME.

U.S. Bankruptcy Court - Hawaii  #16-90011  Dkt # 51  Filed  01/04/17  Page 41 of 67

226.245.    Cabebe facilitated the fraudulent mortgage reduction service businesses by failing to keep books and records, making it difficult for OCP to identify victims of the scheme, and making it difficult for Cabebe to account for the money she received under the schemes.

227.246.    Cabebe further facilitated the fraudulent mortgage reduction service business by failing to report to the taxing authorities any of the income she received under the schemes, and failing to pay taxes on that income.  In addition, none of the income or liabilities relating to MEI or ME has been included in Cabebe's Schedules or Statement of Financial Affairs.

228.247.    Prior to the Bankruptcy Case being filed, Cabebe attempted to frustrate OCP's investigation into the fraudulent mortgage reduction service business by failing to cooperate, representing to OCP that she had no involvement with "Mortgage Enterprise," and by disobeying a subpoena issued and served by OCP, falsely claiming her notary books and seal were lost and/or stolen.

229.248.    To this day the money collected by MEI and ME remains unaccounted for, and Cabebe's Schedules and Statement of Financial Affairs offer no clues.

230.249.    OCP has already successfully prosecuted claims against Henry Malinay for his involvement in both MEI and ME.

231.250.    Henry Malinay never denied his involvement in the fraudulent schemes, but merely indicated that there were others persons involved, notably Cabebe and Williams.

232.251.    Williams is known to have been wrongfully incarcerated from September 13, 2013, and continuing thereafter for nine months.  Before, during, and after Williams' release from prison, Cabebe was actively involved in operating both MEI and ME.

233.252.    At all relevant times, MEI and ME were fraudulent schemes.

234.253.    The MEI mortgages and financing statements filed in the BOC and the ME financing statements filed in the BOC were never going to work to reduce anyone's mortgage loan balance by one-half.

235.254.    At all relevant times, through her having done business as MEI and ME, Cabebe engaged in unlawful conduct consisting of multiple instances of common law fraud involving repeated and flagrant violations of applicable consumer protection laws.

236.255.    Cabebe has deliberately and unreasonably failed and refused to cooperate with the investigation into her involvement in MEI and ME being conducted by OCP.

237.256.    Cabebe knowingly and falsely reported to the State Attorney General that her notary seal and notary book had been lost on March 28, 2015.

U.S. Bankruptcy Court - Hawaii   #16-90011   Dkt # 51   Filed  01/04/17   Page 43 of 67

238.257.    After having been served by OCP with a subpoena duces tecum for her notary books on April 9, 2015, Cabebe knowingly and falsely claimed her notary book had been stolen the day before.

239.258.    Cabebe has engaged in professional misconduct sufficient to warrant the revocation, suspension or denial of her status as a notary public.

240.259.    Cabebe has knowingly and deliberately failed to disclose the identity of her creditors that fell victim to the MEI or ME scams, and Cabebe has deliberately acted to preclude OCP from learning the identity of said creditors or the amounts of their claims.

241.260.    OCP seeks to have the Bankruptcy Court liquidate and adjudicate the underlying claims, determine the debts to be nondischargeable, order injunctive relief so that Cabebe is enjoined from defrauding consumers in the future, order declaratory relief such that all of the MEI mortgages, and all of the MEI financing statements, and all of the ME financing statements are declared void and released, and for such other relief as may be appropriate. OCP further seeks to have the Bankruptcy Court enjoin MEI and ME from defrauding consumers in the future, and an order requiring MEI and ME to disgorge all monies collected from consumers.

# COUNT I

### (Nondischargeable Debt Stemming From
### Common Law Fraud Violative of HRS Chapter 480,
### HRS Chapter 480E, and 12 C.F.R. Part 1015 (the "MARS Rule"))

### (11 U.S.C. § 523(a)(2)(A): Involving False Pretenses, False Representations, and Actual Fraud, Including Aiding and Abetting Actual Fraud)

242.261.    Plaintiff repeats incorporates by reference and hereby realleges each and every the allegations contained in the proceeding paragraphs 1 through 243 of this First Amended Complaint as though set forth fully herein.

243.262.    The prospective clients of the MEI and ME mortgage reduction service were consumers, being people who would use the service primarily for their own personal, family, or household purposes.

244.263.    Cabebe sold the MEI and ME mortgage reduction service to consumers knowing that the service did not work.

245.264.    Cabebe misrepresented to prospective clients that MEI guarantees its ability to both secure a monthly mortgage service payment that is one-half of the homeowner's current mortgage payment and to reduce the homeowner's current mortgage loan pay-off term by one-half.

246.265.    Cabebe misrepresented to prospective clients that MEI would fully refund any homeowner if MEI fails to secure a mortgage service payment that is one-half of the homeowner's current mortgage loan payment.

45

247.266.    Cabebe misrepresented to prospective clients that because of the MEI refund guarantee, there was "no risk" to the consumer if MEI was unsuccessful in reducing a client's current mortgage loan payment by one-half.

248.267.    Cabebe misrepresented to prospective clients that MEI has a "rock solid proven method" of reducing mortgages that had "yielded a 100% success rate" that allowed the company to stand firmly behind its guarantee.

249.268.    Cabebe misrepresented to prospective clients that mortgages held by their lenders or servicers would be rendered invalid and unenforceable as the result of MEI's mortgage reduction service.

250.269.    Cabebe misrepresented to prospective clients that ME guarantees its ability to both secure a monthly mortgage service payment that is one-half of the homeowner's current mortgage payment and to reduce the homeowner's current mortgage loan pay-off term by one-half.

251.270.    Cabebe misrepresented to prospective clients that ME would fully refund any homeowner if ME fails to secure a mortgage service payment that is one-half of the homeowner's current mortgage loan payment.

252.271.    Cabebe misrepresented to prospective clients that because of the ME refund guarantee, there was "no risk" to the consumer if ME was unsuccessful in reducing a client's current mortgage loan payment by one-half.

253.272.     Cabebe misrepresented to prospective clients that ME has a "rock solid proven method" of reducing mortgages that had "yielded a 100% success rate" that allowed the company to stand firmly behind its guarantee.

254.273.     Cabebe misrepresented to prospective clients that mortgages held by their lenders or servicers would be rendered invalid and unenforceable as the result of ME's mortgage reduction service.

255.274.     Cabebe's false representations of material facts to consumers were intended to induce consumers to act by signing up and paying for the mortgage reduction service offered by MEI or ME.

256.275.     Cabebe made these representations to consumers with knowledge of, or reckless disregard for, their falsity.

257.276.     Cabebe made these representations to consumers with the intention of deceiving consumers for her own personal gain, being the money collected for the bogus MEI and ME services.

258.277.     Consumers justifiably relied upon Cabebe's false representations to their detriment.

259.278.     Cabebe committed **common law fraud** under Hawaii law by operating MEI and ME.

260.279.     In carrying out the fraud, Cabebe's operation of MEI and ME violated applicable consumer protection laws, including **HRS Chapter 480**.

47

261.280.    Cabebe's involvement in MEI and ME violated Hawaii's prohibition of unfair or deceptive acts or practices in the conduct of any trade or commerce set forth in HRS Chapter 480.

262.281.    The homeowners who contracted with Cabebe for the services of MEI or ME as described herein were and are at all times relevant herein "consumers," as that term is defined in HRS § 480-1.

263.282.    Cabebe at all relevant times knew that neither MEI nor ME could deliver the mortgage reductions promised to consumers, yet at no time did she ever inform any of the consumers that the service did not work.

264.283.    Cabebe filed the MEI financing statements and MEI mortgages in the BOC with the intent and for the purpose of misleading consumers into believing that these MEI recordings would affect the validity and enforceability of prior mortgages held by the clients' lenders or servicers.

265.284.    Cabebe filed the ME financing statements in the BOC with the intent and for the purpose of misleading consumers into believing that these ME recordings would affect the validity and enforceability of prior mortgages held by the clients' lenders or servicers.

266.285.    Consumers were misled to believe the MEI or ME documents filed on their behalf at the BOC by Cabebe legally reduced the consumers' mortgage loan balances by one-half, when the filings had no legal effect whatsoever.

267.286.   Cabebe's misrepresentations made to consumers in furtherance of the mortgage reduction scams known as MEI and ME, as more specifically set forth above, offend established public policy and are immoral, unethical oppressive, unscrupulous or substantially injurious to consumers, and thus constitute unfair or deceptive acts or practices in the conduct of any trade or commerce in violation of HRS §480-2(a).

268.287.   The conduct of Cabebe constitutes a series of separate and independent acts or practices which are unfair and/or deceptive and in violation of HRS § 480-2(a), and this unlawful conduct constitutes common law fraud.

269.288.   The arrangement whereby Cabebe received money from consumers for a phony mortgage reduction service known as MEI or ME violates HRS Chapter 480, and is rendered void by HRS § 480-12, entitling the consumers to the return of their money in the form of restitution.

270.289.   OCP is entitled to the imposition of non-compensatory fines and penalties under HRS § 480-3.1.

271.290.   To the extent the consumer-victims of the MEI and ME mortgage reduction schemes were elderly, being persons aged sixty-two or older, OCP is also entitled to the imposition of additional non-compensatory fines and penalties under HRS § 480-13.5.

272.291.   In light of Cabebe's numerous and repeated violations of HRS Chapter 480, any and all contracts or agreements made with consumers by or on behalf

49

of Cabebe doing business as MEI or ME are void and not enforceable at law or in equity under HRS §§ 480-12 and 1-6, including but not limited to all MEI financing statements, all MEI mortgages, and all ME financing statements, and all such documents recorded in the BOC by or on behalf of MEI or ME for the supposed benefit of consumer-clients of MEI or ME should be declared void and released.

273.292.   In carrying out the fraud, Cabebe's operation of MEI and ME violated applicable consumer protection laws, including **HRS Chapter 480E**.

274.293.   The consumers who contracted with Cabebe for the services of MEI or ME as described herein were and are at all times relevant herein owners of "distressed property," as that term is defined in HRS § 480E-2.

275.294.   Cabebe was acting as a "distressed property consultant" ("Consultant") and targeting owners of "distressed property" as those terms are defined in HRS§ 480E-2, to the extent Cabebe recruited Hawaii consumers who, at the time, owned residential property that: (1) was in foreclosure, or at risk of foreclosure because payment on any loan secured by residential property was more than sixty days delinquent, (2) had a lien or encumbrance charged against it because of nonpayment of any taxes, lease assessments, association fees, or maintenance fees, (3) was at risk of having a lien or encumbrance changed against it because the payment of any taxes, lease assessments, association fees, or maintenance fees was more than ninety days delinquent, (4) secured a loan for which notice of default had been given, or (5) secured a loan that had been accelerated.   In any of these scenarios, the consumers were

50

considered owners of "distressed property" who were entitled to the protections of HRS Chapter 480E.

276.295. As a Consultant, Cabebe is and was at all times relevant herein subject to the requirements and prohibitions applicable to Consultants pursuant to HRS Chapter 480E.

277.296. In her operation of MEI and ME, Cabebe failed to comply with the requirements and prohibitions applicable to Consultants pursuant to HRS Chapter 480E in numerous respects, including but not limited to: (i) failing to use written contracts for the services to be provided, failing to discharge all services to be performed, and failing to disclose the compensation to be received by the Consultant (all as required by HRS § 480E-3), (ii) failing to notify consumers in writing of their right to rescind any agreement, failing to use the precise language required by statute, and failing to use the required cancellation form (all as required by HRS § 480E-4), (iii) misrepresenting or concealing material facts (prohibited by HRS § 480E-10(a)(1)), (iv) failing to identify and describe the services to be performed (as required by HRS § 480E-10(a)(4)), (v) receiving compensation before fully performing (prohibited by HRS § 480E-10(a)(6)), and (vi) receiving compensation in excess of the statutory maximum (in violation of HRS § 480E-10(a)(7)).

278.297. Pursuant to HRS § 480E-11(a), violations of HRS Chapter 480E are per se violations of HRS § 480-2, i.e., Cabebe's violations of HRS Chapter 480E constitute a series of separate and independent acts or practices which are unfair and/or

U.S. Bankruptcy Court - Hawaii  #16-90011  Dkt # 51  Filed  01/04/17  Page 51 of 67

deceptive and in violation of HRS § 480-2(a), and as Cabebe's representations and omissions were both material and likely to mislead consumers, this unlawful conduct constitutes common law fraud.

279.298.　　In light of Cabebe's numerous and repeated violations of HRS Chapters 480E and 480, any and all contracts or agreements made with consumers by or on behalf of Cabebe doing business as MEI or ME are void and not enforceable at law or in equity under HRS §§ 480-12 and 1-6, including but not limited to all MEI financing statements, all MEI mortgages, and all ME financing statements, and all such documents recorded in the BOC by or on behalf of MEI or ME for the supposed benefit of consumer-clients of MEI or ME should be declared void and released.

280.299.　　In carrying out the fraud, Cabebe's operation of MEI and ME violated applicable consumer protection laws, including **12 C.F.R. Part 1015 (the "MARS Rule")**.

281.300.　　Each of the consumers who entered into contracts with Defendant as described herein was and is at all times relevant herein a "Consumer" as that term is defined in MARS Rule § Section 1015.2.

282.301.　　Cabebe was a "Provider" of a "Mortgage Assistance Relief Service," as those terms are defined in MARS Rule § 1015.2, and was at all times required to comply with the MARS Rule.

283.302.　　Cabebe violated MARS Rule § 1015.5(a) by both requesting and receiving advance fees from consumers.

284.303.     Cabebe committed further violations of the MARS Rule by representing that consumers should not contact their lenders (MARS Rule § 1015.3(a)), misrepresenting to consumers the likelihood of obtaining the desired relief (MARS Rule § 1015.3(b)(1)), misrepresenting to consumers the terms of their loans (MARS Rule § 1015.3(b)(5)), misrepresenting to consumers the term or conditions under which they could obtain refunds (MARS Rule § 1015.3(b)(6)), misrepresenting to consumers that the service had been completed (MARS Rule § 1015.3(b)(7)), misrepresenting to consumers that they will receive legal representation (MARS Rule § 1015.3(b)(8)), misrepresenting to consumers the percentage of debt that will be saved through the service (MARS Rule § 1015.3(b)(10)), misrepresenting to consumers the total cost of the service (MARS Rule § 1015.3(b)(12)), providing substantial assistance or support to a service provider knowing the provider is engaged in acts or practices which violate the MARS Rule (MARS Rule § 1015.3(b)(10))(in the event Cabebe is shown to have assisted others more culpable than herself), and failing to keep numerous categories of records for two years (MARS Rule § 1015.9).

285.304.     Cabebe was also prohibited from "[m]isrepresenting, expressly or by implication, any material aspect of any mortgage assistance relief service" under MARS Rule § 1015.3(b).

286.305.     Cabebe violated MARS Rule § 1015.3(b) by concealing from consumers the fact that the service was bogus.

53

287.306.     Conduct prohibited by law, such as the conduct prohibited by the MARS Rule, is violative of public policy, and the violation of public policy violates Hawaii's prohibition of unfair acts or practices codified in HRS § 480-2(a) when coupled with conduct that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.

288.307.     Cabebe's violations of the MARS Rule serve to establish that Cabebe's conduct is violative of HRS § 480-2(a).

289.308.     Cabebe's violations of the MARS Rule constitute a series of separate and independent acts or practices which are unfair and/or deceptive and in violation of HRS § 480-2(a), and as Cabebe's representations and omissions were both material and likely to mislead consumers, this unlawful conduct constitutes common law fraud.

290.309.     In light of Cabebe's numerous and repeated violations of the MARS Rule and HRS Chapter 480, any and all contracts or agreements made with consumers by or on behalf of Cabebe doing business as MEI or ME are void and not enforceable at law or in equity under HRS §§ 480-12 and 1-6, including but not limited to all MEI financing statements, all MEI mortgages, and all ME financing statements, and all such documents recorded in the BOC for the supposed benefit of consumer-clients of MEI or ME should be declared void and released.

U.S. Bankruptcy Court - Hawaii   #16-90011   Dkt # 51   Filed  01/04/17   Page 54 of 67

291.310.     The foregoing alleged conduct entitles OCP to a determination that any and all debts, stemming from Cabebe's operation or involvement in MEI and ME, is nondischargeable under 11 U.S.C. § 523(a)(2)(A).

292.311.     A service contract which could never be performed according to its terms, and which was known by the performing party from the outset of the contract to be a contract for services which could never be performed as promised, like the mortgage reduction that was supposedly accomplished through the recordation of the standard MEI mortgages or MEI financing statements or through the recordation of the standard ME financing statements, is a sham that satisfies the requirements for nondischargeability under 11 U.S.C. § 523(a)(2)(A).

293.312.     Cabebe received fees for selling mortgage reduction service to consumers based upon false pretenses, in that Cabebe knew the mortgage reduction service did not work and did not confer any benefit upon consumers.

294.313.     Cabebe knew but failed to disclose to consumers that the mortgage reduction service did not work and would not reduce consumers' mortgage loan balances by one-half as promised.

295.314.     Cabebe knew but failed to disclose to consumers that the financing statements filed in the BOC on behalf of consumers, which purported to discharge all mortgages recorded against the consumers' real properties, were frivolous, and did not confer any benefit upon the consumers.

296.315.    Cabebe knew but failed to disclose to consumers that neither MEI nor ME had a 100% success rate in lowering consumers' mortgage loan balances by one-half.

297.316.    Cabebe knew but failed to disclose to consumers that neither MEI nor ME issued refunds in the event that the mortgage reduction service failed to lower a consumer's mortgage loan balance by one-half.

298.317.    The foregoing facts known to Cabebe, but not disclosed to consumers, were material to the consumers' decision to sign up for and pay for the mortgage reduction service offered as MEI or ME.

299.318.    Cabebe had a duty to fully and truthfully disclose to consumers material facts about the MEI and ME service that the consumers would not otherwise learn.

300.319.    Cabebe engaged in fraudulent omissions by failing to fully and truthfully disclose to consumers material facts about the MEI and ME service.

301.320.    By concealing the truth from consumers about the MEI and ME service, Cabebe intentionally misled the consumers, in violation of her duty to disclose to them information they would not otherwise learn.

302.321.    Because Cabebe concealed the truth from consumers, including the critical fact that the service did not work, reliance no longer becomes an element under 11 U.S.C. § 523(a)(2)(A).

303.322.    Even if reliance by consumers remained a factor to be proven, in paying for the mortgage reduction service, consumers relied upon their belief that Cabebe would obtain mortgage reductions in the manner in which she said she would.

304.323.    Cabebe also misled consumers about the material facts concerning the MEI and ME service through false pretenses and false representations, thereby allowing consumers to be misled.

305.324.    Everything Cabebe told consumers about the MEI and ME mortgage reduction service was false.

306.325.    The MEI and ME service are and were at all times illegitimate businesses run by Cabebe that promised results which were and are impossible to obtain as promised, i.e., mortgage reductions were not going to be accomplished by Cabebe unilaterally filing in the BOC new mortgages or financing statements that purported to discharge prior liens.

307.326.    As Cabebe knew there was no legitimate mortgage loan reduction service for consumers to purchase, she also knew everything shared with consumers about MEI or ME was false, and thus the injuries to consumers that resulted were foreseeable based upon Cabebe's pattern of conduct.

308.327.    Cabebe has knowingly and fraudulently concealed all information about the income derived from the operation of MEI and ME, including how much money was received, the identity of the consumers who paid for the service, the

57

amounts the consumers paid, how the money was distributed and used, and what remains of the money derived from the operation of MEI and ME.

309.328.    Cabebe's knowingly directing people to an activity that she knew and understood to be a fraud, and collecting money for her ongoing participation, satisfies the meaning of fraud for purposes of nondischargeability under 11 U.S.C. § 523(a)(2)(A).

310.329.    The lenders and servicers of MEI or ME clients never agreed to modify or reduce the loan balances, the monthly payment amounts, or the terms of the loans.

311.330.    Neither MEI nor ME ever successfully reduced a client's mortgage by one-half, as the consumers were both promised and guaranteed.

312.331.    Clients of MEI paid for the alleged mortgage reduction service in advance, and in addition, consumers in many cases made monthly mortgage payments to MEI.

313.332.    Clients of ME also paid for the alleged mortgage reduction service in advance.

314.333.    Consumers justifiably relied upon the false representations made by Cabebe, and upon the false representations made in the MEI or ME paperwork which Cabebe provided to consumers.

315.334.    Cabebe engaged in actual fraud.

316.335.    To the extent Cabebe was not working solely on her own behalf, she was working with an awareness that her actions would contribute to the deception of consumers by promising undeliverable results, and to the extent one or more other people were collaborating, conspiring and/or colluding with her in MEI or ME, Cabebe aided and abetted the actual fraud by virtue of her having rendered substantial assistance to carry out the fraud.

317.336.    The misrepresentations, fraudulent omissions and deceptive conduct by Cabebe, together with Cabebe's knowledge of the falsity or deceptiveness of her statements and conduct, together with Cabebe's intent to deceive consumers and the justifiable reliance on the consumers' part on Cabebe's statements, resulted in injuries proximately caused by the consumers' reliance on Cabebe's statements, papers, and conduct.

318.337.    All liability arising from the fraud is nondischargeable under 11 U.S.C. § 523(a)(2)(A), not just the amount of benefit received by Cabebe.

319.338.    Cabebe's actions have injured consumers, for which Cabebe is liable to pay restitution and fines and penalties, and for which the Court should award appropriate equitable relief, including but not limited to permanent injunctive relief, and declaratory relief that all MEI and ME filings at the BOC are void and released.

320.339.    As Cabebe knew the service was a fraud in that it did not reduce anyone's mortgage, the standard for nondischargeability under 11 U.S.C. § 523(a)(2)(A) is met.

321.   As for Cabebe's creditors who are victims of the ME mortgage reduction scheme and whose claims have already been liquidated and adjudicated in the bankruptcy case of Cabebe's ME collaborator and/or co-conspirator Henry Malinay, attached as Exhibit 20 is a table of the consumers' claims showing: (1) the identities of the consumer-complainants, (2) the OCP case numbers, and (3) the total principal amount of restitution awarded each of the consumer-complainants.

322.340.    As for Cabebe's creditors who are victims of either the MEI or the ME mortgage reduction scheme, who complained to OCP, and whose claims were not already liquidated and adjudicated in the bankruptcy case of Cabebe's ME co-conspirator Henry Malinay, attached as Exhibits 201 and 22 is a are tables listing the additional consumer-complainants' claims, and showing: (1) the identities of the consumer-complainants, (2) the OCP case numbers, and (3) the total principal amount of restitution due and owing to each of the consumer-complainants.

323.341.    All consumer-clients of MEI or ME, being creditors of Cabebe, whether identified or yet to be identified, are entitled to restitution in the amounts paid for the mortgage reduction service, in amounts to be shown, together with pre-judgment and post-judgment interest thereon.

324.342.    With respect to tThe known and adjudicated restitution claims of consumer-victims of MEI and ME, the consumers' claims for restitution, totaling $165,710.4074,000, are nondischargeable under 11 U.S.C. § 523(a)(2)(A).

325. With respect to the known but unadjudicated claims of consumer-victims of ME that have complained to OCP, the consumers' claims for restitution, in amounts to be shown of no less than $52,870.14, are nondischargeable under 11 U.S.C. § 523(a)(2)(A).

326. With respect to the known but unadjudicated claims of consumer-victims of MEI that have complained to OCP, the consumers' claims for restitution, in amounts to be shown of no less than $17,210, are nondischargeable under 11 U.S.C. § 523(a)(2)(A).

327.343. Based upon the numerous violations of HRS § 480-2(a) attributable to Cabebe's involvement in MEI and ME, OCP's entitlement to fines and penalties is mandatory under HRS § 480-3.1.

328.344. As unfair or deceptive acts or practices go, Cabebe's operation of the MEI and ME schemes is egregious.

329.345. Non-compensatory fines and penalties totaling $10,000 per consumer-victim is reasonable and appropriate.

330.346. Additional non-compensatory fines and penalties totaling $10,000 per elder-consumer-victim under HRS § 480-13.5 is reasonable and appropriate.

331.347. OCP's claim for non-compensatory fines and penalties, in an amount to be shown of no less than 165,710.40$1,010,000, is automatically rendered nondischargeable under 11 U.S.C. § 523(a)(7).

61

332.348.    Permanent injunctive relief is also warranted.

349.    Pursuant to 11 U.S.C. § 523(a)(2)(A), OCP is entitled to a denial of discharge of Cabebe's debts owed to both (i) identified consumer victims of MEI or ME, and (ii) yet to be identified consumer victims of MEI or ME, because all of this debt was incurred through Cabebe's conduct stemming from common law fraud involving false pretenses, false representations, actual fraud and aiding and abetting actual fraud.

## COUNT II

### (Disgorgement)

350.    Plaintiff repeats and realleges each and every allegation contained in the proceeding paragraphs of this First Amended Complaint as though set forth fully herein.

351.    At all material times to this First Amended Complaint, MEI and ME, acting in concert with Cabebe and other individuals, advertised, marketed, provided, offered to provide, or arranged for other to provide, services in Hawaii to consumers, being people who would use the service primarily for their own personal, family, or household purposes.

352.    The services of MEI and ME would purportedly provide consumers with mortgage relief services guaranteed to cut in half a homeowner's mortgage loan balance, monthly mortgage payment, and mortgage loan term.

353.   The conduct of MEI and ME constitutes unfair and deceptive acts and practices in violation of HRS Chapters 480 and 480E, and the MARS Rule, and constitutes common law fraud.

354.   MEI and ME received funds from consumers for alleged services which were guaranteed to produce certain mortgage relief benefits which were never delivered as promised.

355.   In truth and in fact, MEI and ME do not return the money consumers paid for mortgage relief benefits which were never obtained.

356.   MEI and ME have no legitimate claim to the funds received from consumers for payment of mortgage relief services.

357.   To remedy the wrongdoing of MEI and ME, the Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including the disgorgement of ill-gotten monies.

333.358.   OCP is entitled to an order requiring MEI and ME to disgorge all funds received from consumers, all of which constitute ill-gotten monies traceable to unlawful conduct.

### Request for Relief

WHEREFORE, Plaintiff OCP prays that this Court:

A.   Enter final judgment in favor of Plaintiff OCP and against Defendant Cabebe: (i) adjudicating and liquidating OCP's claims from common law fraud, (ii) awarding restitution to consumers, (iii) imposing non-compensatory civil fines

and penalties payable to OCP under HRS §§ 480-3.1 and 480-13.5 , (iv) declaring that the restitution owed consumers is nondischargeable pursuant to 11 U.S.C. §§ 1328(a)(2) and 523(a)(2)(A), and (v) declaring that the non-compensatory fines and penalties awarded to OCP are nondischargeable pursuant to 11 U.S.C. §§ 1328(a)(2) and 523(a)(7), and (vi) awarding such other and further relief as may be deemed appropriate.

B.     Enter final judgment in favor of Plaintiff OCP and against Defendant Cabebe, MEI and ME:, (vi) awarding declaratory relief as more particularly described below, (vii) awarding permanent injunctive relief as more particularly described below, and (viii) awarding such other and further relief as may be deemed appropriate.

C.     Enter final judgment in favor of Plaintiff OCP and against MEI and ME: (i) requiring MEI and ME to disgorge the ill-gotten monies received from consumers, and (ii) awarding such other and further relief as may be deemed appropriate.

D.B.  Award declaratory relief under HRS §§ 480-12 and 1-6, such that: (i) any and all contracts or agreements, made with consumers by or on behalf of Cabebe, doing business as MEI or ME, are rendered void and not enforceable at law or in equity under HRS §§ 480-12 and 1-6, including but not limited to all MEI financing statements, all MEI mortgages, and all ME financing statements, and (ii) all such all MEI financing statements, MEI mortgages, and ME financing statements

64

recorded in the BOC by or on behalf of Cabebe, MEI or ME be declared void and released.

E.C.   Award Plaintiff OCP appropriate permanent injunctive relief such that MEI, ME and Cabebe, and all her agents, successors, assigns and all other persons acting in concert or in participation with MEI, ME or Cabebe, her on the business of MEI or ME are permanently enjoined from:

1.     Publishing, broadcasting or disseminating through any medium, including the internet and email, any advertisement, announcement, promotion or statement to homeowners offering services in any way related to mortgages, foreclosure, loans, liens, debt relief, or debt adjustment, including but not limited to services pertaining to mortgage reduction, foreclosure avoidance, foreclosure relief, foreclosure defense, loan modification, refinancing, debt counseling, debt relief, debt forgiveness, debt consolidation, and credit counseling.

2.     Providing any kind of financial advice to homeowners, including advising homeowners not to pay their mortgages, creditors or debts, or advising homeowners not to communicate with their creditors.

3.     Recording any documents in the Bureau of Conveyances of the State of Hawaii except those legitimate filings which pertain personally to Cabebe.

4.      Acting as a "distressed property consultant" as that term is defined

in HRS § 480E-2.

5.   Acting as a "Provider" as that term is defined in MARS Rule § 1015.2.

6.   Engaging in any and all activity that involves real property in which the real property that:

a.   is in foreclosure, or at risk of foreclosure because payment on any loan secured by residential property is more than sixty days delinquent;

b.   had a lien or encumbrance charged against it because of nonpayment of any taxes, lease assessments, association fees, or maintenance fees;

c.   is at risk of having a lien or encumbrance changed against it because the payment of any taxes, lease assessments, association fees, or maintenance fees was more than ninety days delinquent;

d.   secures a loan for which notice of default had been given; or

e.   secures a loan that has been accelerated.

7.   Such other additional injunctive relief as may prove warranted by OCP's ongoing investigation of these matters.

F.D.   Award Plaintiff OCP reimbursement of the costs of its investigation.

U.S. Bankruptcy Court - Hawaii   #16-90011   Dkt # 51   Filed  01/04/17   Page 66 of 67

G.E. Award Plaintiff OCP such other relief as the Court deems just and proper.

DATED:  Honolulu, Hawaii, December  February 22, 2016.

/s/ James F. Evers
JAMES F. EVERS
Attorneys for State of Hawaii
Office of Consumer Protection